OPINION OF THE COURT
Kaye, J.
In this prosecution for rape and related crimes, the central issue is whether the trial court erred in its pretrial ruling that would have allowed the People to cross-examine defendant (if he testified in his own defense) regarding two other criminal charges that were pending against him. We conclude that, in the circumstances presented, the pretrial ruling was erroneous, and the Appellate Division correctly ordered a new trial on that basis.
On September 10, 1988, the victim — a married college professor — was driving from her home near Ithaca to a family wedding in Lake George, when at about 7:30 p.m. she was stopped on the Northway by defendant, then a uniformed State Trooper. At defendant’s request, she gave him her license and registration. Defendant told her she was driving erratically and had failed to signal a lane change properly. He instructed her to leave her car, walk a straight line, and then enter the passenger seat of the patrol car, where he told her she could be in serious trouble, including "driving while intoxicated” charges, and would have to blow in his face as a sobriety test. While she was doing this a second time at defendant’s behest, he put his mouth on hers, began fondling her, and told her he was going to "make it” or "do it” with her, but first had to go to State Police barracks for a condom. The victim followed defendant to the barracks in her own car, though he retained her license and registration. She testified that she remained terrified throughout this entire period believing that, with defendant armed, any escape attempt in an unfamiliar area would be futile and possibly even fatal.
At the barracks, defendant placed the victim in the police *467 car, instructing her to remain there while he went inside. She testified that she was still frozen with fear, not knowing whether defendant had friends in the barracks who knew what he was doing. On his return, they drove off while the victim — believing it vital to her safety — engaged defendant in conversation. When they reached a secluded area, defendant, still armed, sexually attacked her. He thereafter returned with her to the barracks and allowed her to proceed to her destination, where she explained to the wedding guests that she was late because of car trouble. On her return home— after being unable to eat or sleep for two days, and overcoming her fear that defendant would harm her — the victim contacted a local rape crisis center, which ultimately led to a report to the State Police, an investigation, and defendant’s arrest. Defendant was convicted of rape, sodomy, sexual abuse, coercion, unlawful imprisonment and official misconduct.
Essentially two errors were alleged on defendant’s appeal to the Appellate Division — the first relating to a pretrial ruling that would have permitted the People to cross-examine defendant regarding two other pending charges, the second relating to expert testimony regarding rape trauma syndrome. A divided Appellate Division overturned defendant’s conviction on the first issue, and a Justice of that court granted leave to appeal. We now affirm.
The Pretrial Ruling Regarding Other Pending Charges
While awaiting trial, defendant was indicted for official misconduct and criminal impersonation (Penal Law § 195.00 [1]; § 190.25 [3]). Those later charges arose out of defendant’s efforts, after he had been suspended from the force, to obtain the victim’s records from the Department of Motor Vehicles (DMV) by representing that he was a State Trooper investigating a crime in which she was a defendant.
Before trial on the rape charges commenced, the People advised defendant that, if he testified, they would cross-examine him about specified prior criminal and immoral acts affecting his credibility. On defendant’s pretrial motion addressed to the permissible scope of cross-examination regarding those acts, the trial court precluded the People’s cross-examination regarding complaints by other women that defendant, as a State Trooper, had for no reason pulled them over and engaged in inappropriate behavior. Additionally, the court limited the People’s inquiry into two areas involving claims of *468 assault by defendant’s wife and mistress. As to the DMV incident, however, the trial court concluded that if defendant testified, he would be deemed to have waived his privilege against self-incrimination and exposed to cross-examination. Defense counsel announced before opening statements that, based on that ruling, defendant would not testify.
The Appellate Division determined that the trial court’s ruling was erroneous, reversed the conviction, and ordered a new trial. Relying on People v Betts (70 NY2d 289), the court observed that permitting cross-examination of a defendant regarding other pending unrelated charges, for credibility purposes only, unduly compromised defendant’s right to testify in the case on trial and jeopardized the corresponding right not to incriminate himself as to the other charges. The Appellate Division further concluded that the People’s attempt to invest the evidence with independent relevance aside from credibility did not bear up under scrutiny. We agree with both conclusions.
Defendants who take the stand, like other witnesses, place their credibility in issue, and thus may be cross-examined on past criminal or immoral acts affecting credibility (People v Sorge, 301 NY 198, 200; People v Johnston, 228 NY 332, 340). Recognizing the importance of a defendant’s informed choice whether or not to testify, in People v Sandoval (34 NY2d 371) we held that a defendant is entitled to a pretrial ruling on the scope of permissible cross-examination as to such prior misconduct (34 NY2d, at 375). A Sandoval ruling, which balances the probative value of the evidence against the risk of unfair prejudice, is " 'largely, if not completely’ a discretionary determination for the trial courts and fact-reviewing intermediate appellate courts, and * * * generally no further review by this Court is warranted.” (People v Mattiace, 77 NY2d 269, 274.)
While per se rules in this area are eschewed, where defendant’s misconduct is another pending criminal charge a more categorical approach is appropriate because of the constitutional protections against self-incrimination (NY Const, art I, § 6; US Const 5th Amend). Cross-examination on an unrelated pending criminal charge, solely for the purpose of impeaching defendant’s credibility, is impermissible (People v Betts, 70 NY2d 289, supra). As we held in Betts:
"Allowing a defendant-witness’ credibility to be assailed through the use of cross-examination con *469 cerning an unrelated pending criminal charge unduly compromises the defendant’s right to testify with respect to the case on trial, while simultaneously jeopardizing the correspondingly important right not to incriminate oneself as to the pending matter.” (70 NY2d, at 295.)
At the Sandoval hearing in this case, the People urged that cross-examination regarding defendant’s alleged unlawful attempt to obtain complainant’s driving records was appropriate because it went "directly to the issue of [defendant’s] credibility.” Betts unambiguously held that "a defendant-witness does not generally and automatically waive the privilege against self-incrimination as to pending collateral criminal charges” (70 NY2d, at 294-295). On the authority of Betts— decided nearly two years before trial — the People should therefore have been denied permission to cross-examine defendant on those charges.
The Appellate Division majority also correctly rejected the People’s alternative claim that the DMV incident was related to the rape charges, as evincing a consciousness of guilt. We need not reach the question whether consciousness of guilt could ever be a sufficient nexus to permit cross-examination under Betts because we conclude that the pending charges do not evidence defendant’s consciousness of guilt.[1]
Certain postcrime conduct is "indicative of a consciousness of guilt, and hence of guilt itself.” (People v Reddy, 261 NY 479, 486.) Reddy, a case involving evidence of flight, noted that such evidence betrayed an awareness of guilt, citing Proverbs (ch XXVIII, v 1): "The wicked flee, even when no man pursueth; but the righteous are bold as a lion.” (See also, People v Yazum, 13 NY2d 302; People v Fiorentino, 197 NY 560, 567.) Other conduct that has been recognized as revealing a guilty mind includes false statements or alibis (People v Moses, 63 *470 NY2d 299, 308; People v Leyra, 1 NY2d 199, 208); coercion or harassment of witnesses (People v Shilitano, 218 NY 161, 179; see, People v Plummer, 36 NY2d 161); and abandonment or concealment of evidence (People v Alexander, 37 NY2d 202, 204; People v Butterly, 25 NY2d 159, 162-163).
Consciousness of guilt evidence has consistently been viewed as weak because the connection between the conduct and a guilty mind often is tenuous (see, People v Yazum, 13 NY2d, at 304, supra; People v Leyra, 1 NY2d, at 209, supra). Even innocent persons, fearing wrongful conviction, may flee or lie to extricate themselves from situations that look damning (see, People v Moses, 63 NY2d, at 308, supra).
The issue here, however, is not sufficiency but admissibility of evidence. Even equivocal consciousness-of-guilt evidence may be admissible so long as it is relevant, meaning that it has a tendency to establish the fact sought to be proved — that defendant was aware of guilt (see, People v Yazum, 13 NY2d, at 304, supra).[2]
We agree with the Appellate Division that defendant’s conduct at the DMV did not reach the threshold for admissibility as consciousness of guilt. The People contend that defendant’s attempt to secure the victim’s driving records was a "natural step” in an effort to harass or intimidate her. This argument overlooks the absence of any evidence — the crucial "next step” — that defendant actually intended to coerce the witness. Such a conclusion would not be a reasonable inference from the attempt to obtain driving records, but would be pure speculation. Indeed, it is a common part of the defense process to investigate the background of adverse witnesses for potential impeachment material. Such efforts alone would generally not constitute a consciousness of guilt.
The People claim, however, that the method defendant used to obtain the information — misrepresentations and false statements — is analogous to the false statements and alibis that have been admitted as consciousness of guilt. Defendant’s misrepresentations to the DMV clerk that he was an active State Trooper investigating the victim are not the sort of false statements about a crime that would be admissible as consciousness of guilt. No valid inference could be drawn from the deceptions that defendant was manifesting an awareness *471 of guilt on the rape charges. Finally, we fail to see the asserted analogy between defendant’s conduct and tampering with or fabrication of evidence.
Thus, we agree with the Appellate Division that in its pretrial ruling the trial court committed reversible error necessitating a new trial.
Rape Trauma Syndrome Expert Testimony
In that there must be a new trial, we briefly consider — as did the Appellate Division — defendant’s challenge to the People’s expert testimony regarding rape trauma syndrome.
The People’s final witness on its case-in-chief was Dr. Ann Burgess, an expert on rape trauma syndrome. Defendant acknowledges that there "can be little doubt as the qualifications of Dr. Burgess to testify as an expert in this regard.” Dr. Burgess had never met or evaluated the victim; her direct testimony consisted largely of answers to three hypothetical questions.
The prosecutor first asked Dr. Burgess to assume certain facts about a hypothetical woman — setting forth, in chronological fashion, the victim’s version of the facts from the stop of her vehicle to defendant’s first advances in the police car — and then asked "how that woman would react.” Dr. Burgess answered that the "woman would react by doing exactly as she was told * * * [b]ecause of the behavior, the authority figure, the gun, the order, and her view of this as something that she must do.”
In his next question, the prosecutor followed the same format — repeating the victim’s fact recitation between the trip to State Police barracks and the assault — and he elicited the expert’s response that the hypothetical woman "would comply” and would not try to get away in her own car because of fear and stress concerning what else the officer might do. Finally, in response to the prosecutor’s questions as to how the hypothetical woman would report the incident, Dr. Burgess responded that, out of "fear of who this person was,” she probably would not report it.
The Appellate Division found no error in this examination, concluding that, just as in People v Taylor (75 NY2d 277), the purpose of the testimony was a permissible one: to explain behavior on the part of the victim that might seem unusual to a lay jury unfamiliar with the patterns of response exhibited *472 by rape victims. We note that this case is somewhat different from Taylor, and certain arguments defendant advances about that difference may have relevance to the retrial.
Beginning in the 1970’s, scientific studies have described identifiable patterns of response among victims (see, People v Taylor, 75 NY2d, at 285-286, supra). Dr. Burgess’ influential article, Rape Trauma Syndrome (131 Am J Psychiatry 981 [1974]), described an acute and a long-term phase of recovery, the acute phase beginning immediately after the incident. As recounted in that article and others, a victim’s behavior following the assault may seem unusual — such as remaining calm and composed, failing to report the incident immediately, or falsely claiming not to know the attacker — but nevertheless may not be an unusual response to the attack. We noted in Taylor that rape trauma syndrome was generally accepted in the relevant scientific community, and thus expert testimony to dispel juror misconceptions regarding the ordinary responses of rape victims would be admissible (People v Taylor, at 292-293, supra).
In this case, a large part of the expert evidence concerned the victim’s behavior as the sexual attack unfolded, rather than after it. Dr. Burgess opined that the hypothetical woman, and women generally, when threatened by an armed authority figure would submit, without resistance, to the sexual attack described, as a means of self-preservation. Thus, defendant correctly notes that the first two hypotheticals were not concerned with the rape trauma syndrome evidence described in Taylor, which related to post-rape behavior.
That this portion of Dr. Burgess’ testimony is not precisely the type of testimony discussed in Taylor does not mean that such evidence would necessarily be inadmissible. It is sufficiently distinct from the kind of evidence we considered in Taylor, however, that our holding in that case does not govern its admissibility here.[3] Assuming such expert evidence is again offered, and the objection lodged that is now before us, the court should determine at retrial whether the expert’s opinion has the requisite scientific foundation.
Even where that foundation is established, expert evidence *473 is not in all instances admissible. While proper to help "clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror” (De Long v County of Erie, 60 NY2d 296, 307), expert opinion is inadmissible when introduced merely to prove that a sexual assault took place (People v Taylor, 75 NY2d, at 293, supra), or bolster a witness’ credibility (People v Ciaccio, 47 NY2d 431). In such instances, the potential value of the evidence is outweighed by the possibility of undue prejudice to the defendant or interference with the province of the jury.
Taylor itself illustrates these principles. In Taylor, we upheld the admission of expert testimony of rape trauma syndrome to explain the reaction of a rape victim in the hours following the attack — behavior that was otherwise not within the common understanding of the average juror. In the companion case, however — People v Banks — we concluded that expert opinion that a person exhibiting certain symptoms "suffered from rape trauma syndrome” would be inadmissible because it bore solely on proving that a rape had occurred, and defendant would be unacceptably prejudiced by rape trauma syndrome evidence for that purpose alone (People v Taylor, 75 NY2d, at 293, supra).
Thus, should similar expert testimony be proffered at a retrial of this case, and objection voiced, the trial court would be called upon to make two determinations not previously made: first, whether the evidence has the requisite scientific basis, and second, whether its potential value outweighs the possibility of undue prejudice to defendant or interference with the jury’s province to determine credibility. In that these determinations are fact-intensive, and the outcome may vary with the scope and form of actual questioning, at this juncture we merely identify the issues, which — contrary to the observation of the Appellate Division — were not addressed in Taylor.
The trial court’s pretrial ruling permitting cross-examination on other pending charges requires reversal of defendant’s conviction and a new trial. Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Titone, Hancock, Jr., and Bellacosa concur; Judge Simons taking no part.
Order affirmed.

. The People’s two grounds for distinguishing Betts are in fact a single argument. The People first posit that the outstanding charge need only be "substantively relevant” to the case on trial to fall outside Betts, and that consciousness of guilt establishes just such a substantive connection. The People then argue that even if a stronger connection need be shown — that the crimes be "directly related” — that test is also satisfied because the charges could have been joined under CPL 200.20 (2) (b) (offenses could be joined if proof of one crime would be admissible as evidence-in-chief on another). The People claim, however, that proof of the DMV incident would be admissible in the rape trial for the same reason advanced in its first argument: it evinces consciousness of guilt.

. Of course, relevancy is not the sole measure of admissibility. The court must also determine that the probative value of the evidence outweighs the risk of prejudice.

. The parties have not addressed and we therefore do not consider whether expert testimony concerning rape trauma syndrome is admissible to explain behavior that follows a sexual assault other than rape, and therefore whether it was admissible in this case because a sexual assault was completed before the rape occurred.